UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

NANCY M. MUIR Executrix of the Estate of
JOSEPH L. MUIR, Deceased


                                        Plaintiff,


          v.                                            Civil Action No.: 16-cv-89

LAMORAK INSURANCE COMPANY, f/k/a
ONE BEACON AMERICA INSURANCE COMPANY,


RESOLUTE MANAGEMENT, INC.,


PROVIDENCE WASHINGTON
INSURANCE COMPANY, f/k/a
SEATON INSURANCE COMPANY,


CONTINENTAL INSURANCE
COMPANY (CNA),


HARPER INSURANCE LIMITED, and


ASSICURAZIONI GENERALI, SPA,

_____



**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT
AGAINST DEFENDANTS CONTINENTAL INSURANCE COMPANY,
HARPER INSURANCE LIMITED AND ASSICURAZIONI GENERALI, SPA**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ...................................................................................................... 2

POINT I

FOLLOWING THE DECISION OF THE NEW YORK STATE COURT
OF APPEALS IN *VIKING PUMP*, "ALL SUMS" PAYMENT APPLIES
TO THE DEFENDANTS' 1976-1977 EXCESS POLICY YEAR BY
VERTICAL EXHAUSTION .................................................................................. 2

    A. THE PLAINTIFFS ARE ENTITLED TO COLLECT THEIR ENTIRE
       JUDGMENTS FROM ONE ANNUAL POLICY PERIOD ............................................. 2

    B. FOR PAYMENTS OF THE PLAINTIFFS' JUDGMENTS, THE DEFENDANTS
       HAVE MERGED POLICY LIMITS THAT TOTAL $20,000,000 ................................. 3

    C. THE DEFENDANTS' POLICIES ATTACH TO ONE SCHEDULED PRIMARY
       POLICY ............................................................................................................ 4

    D. THE GULF & WESTERN INSURANCE PROGRAM LISTS HEDMAN AS A
       NAMED INSURED ............................................................................................. 6

    E. DEFENDANTS' REQUEST THAT THE COURT APPLY PRO-RATA
       ALLOCATION FOR THE PLAINTIFFS' JUDGMENTS SHOULD BE DENIED ............... 7

    F. THE EXCESS POLICIES ARE NOT REDUCED SINCE THE STACKING OF
       MULTI-YEAR POLICY LIMITS IS NOT AN ISSUE FOR PAYMENT OF
       THE DUREZ JUDGMENTS ................................................................................ 11

    G. HARPER/ASSICURAZIONI'S "SELF-ALLOCATION" FORMULA
       VIOLATES THE ALL SUMS DOCTRINE AND THE STATED LIMITS
       TERMS OF THEIR EXCESS POLICIES ............................................................... 13

POINT II

THE DEFENDANTS' BUY-BACK AGREEMENTS ARE NO
DEFENSE TO INSURANCE LAW § 3420 ENFORCEMENT RIGHTS
AND THE DEFENDANTS ARE ESTOPPED FROM DENYING THAT
THEIR EXCESS POLICIES COVER HEDMAN FOR ASBESTOS-
RELATED CLAIMS .......................................................................................... 16

    A. THE DEFENDANTS MUST PAY ALL SUMS CAUSED BY OCCURRENCES
       DURING THEIR POLICIES ................................................................................ 17

    B. THE DEFENDANTS' BUY-BACK AGREEMENTS ARE NO DEFENSE TO
       THE PLAINTIFFS' INSURANCE LAW §3420 CLAIMS ........................................ 22

i

C.  THE DEFENDANTS CANNOT LITIGATE "COVERAGE DEFENSES" IN A
    DIRECT ACTION CASE .................................................................... 25

D.  THE DEFENDANTS ACCEPTED THAT HEDMAN WAS COVERED UNDER
    THE GULF & WESTERN INSURANCE PROGRAM ............................... 27

POINT III

THE COURT SHOULD DENY THE DEFENDANTS' APPLICATION
FOR ADDITIONAL DISCOVERY ......................................................... 32

A.  THE DEFENDANTS' CLAIM THAT THEY NOW NEED DISCOVERY
    FROM HEDMAN OR TCI, INC. IS MERITLESS ................................. 32

B.  THERE ARE NO GROUNDS TO GRANT DISCOVERY ON THE
    DEFENDANTS' CLAIM THAT THE *MUIR* VERDICT WAS BASED UPON
    EXPECTED AND INTENDED ACTS OF HEDMAN ............................... 36

C.  THE DEFENDANTS HAVE NO BASIS TO ASK FOR DISCOVERY
    REGARDING MR. MUIR'S EXPOSURE TO HEDMAN'S ASBESTOS FIBER ........... 38

D.  THE DEFENDANTS HAVE NO BASIS TO ASK FOR DISCOVERY TO
    RETAIN AN EXPERT ...................................................................... 39

CONCLUSION ................................................................................ 40

# TABLE OF AUTHORITIES

Page

CASES

*American Home Products Corp. v. Liberty Mutual Insurance Co.*,
748 F.2d 760 (2d Cir. 1984)......................................................... 20

*American Ref-Fuel Co. of Hempstead v. Employers Ins. Co. of Wausau,*
265 A.D.2d 49 (2d Dept. 2000) .................................................. 27

*Anderson v. Liberty Lobby, Inc.,,*
477 U.S. 242, 249-50 (1985) ....................................................... 1

*Arida v. Essex Insurance Co*.,
750 N.Y.S. 2d 725 (4th Dept. 2002) ........................................... 24

*Bowker v. New York State Insurance Fund,*
39 A.D.3d 1162 (4th Dept. 2007) ............................................... 26

*City of Johnstown v Bankers Std. Ins. Co.*,
877 F.2d 1146 (2d Cir. 1989)...................................................... 20

*Columbia Cas. Co. v. National Emergency Servs.*,
282 A.D.2d 346 (1st Dept. 2001)................................................. 27

*Consolidated Edison v. Allstate Ins. Co.*,
98 N.Y.2d 208 (2002) ............................................................. 20, 21

*Consorti v. Owens-Corning Fiberglas Corp*.,
86 N.Y.2d 449 (1995) .................................................................. 19

*Continental Cas. Co. v. Employers Ins. Co. of Warsaw*
60 A.D. 3d 128 (1st Dept. 2008).................................................. 10

*Continental Casualty Co. v. Rapid-American Corp.*,
80 N.Y.2d 640 (1993) ............................................................. 20, 38

*Frison Corp v. Lumberman's Mutual Cas. Co.*,
645 N.Y.S. 2d 230 (4th Dept. 1996) ........................................... 24

*Hiraldo v. Allstate Ins. Co.*,
5 N.Y.3d 508 (4th Dept. 2015) .................................................... 12

*In re: Viking Pump, Inc. and Warren Pumps, LLC, Insurance Appeals,*
27 N.Y.3d 244 ............................................. 1, 2, 4, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 23, 38, 40

*John Doris, Inc. v. Solomon R. Guggenheim Foundation,*
209 A.D.2d 380 (2d Dept. 1994) ................................................. 15

*Lang v. Hanover Insurance Co.,*
3 N.Y.3d 350 (N.Y. 2004) ................................................. 25, 26

*Lawyers Fund v. Bank Leumi Trust,*
94 N.Y.2d 398 (2000) ................................................. 15

*Liberty Mutual v. The Fairbanks Co.,*
17 F.Supp.3d 385 (SDNY 2014) ................................................. 12

*Mastrocovo v. Capizzi*
87 A.D.3rd 1296 (4th Dept. 2012) ................................................. 15

*Matter of Midland Insurance Co.,*
269 A.D.2d 50 (1st Dept. 2000) ................................................. 20

*Matter of New York City Asbestos Litigation,*
41 A.D.3rd 299 ................................................. 15

*Nesmith v. Allstate Ins. Co.,*
24 N.Y.3d 520 (4th Dept. 2014) ................................................. 12

*Republic Franklin Ins. Co. v. Pistilli,*
16 A.D.3d 477 (2d Dept. 2005) ................................................. 26

*Roman Catholic Diocese of Brooklyn vs National Union Fire Insurance Co.,*
21 N.Y.3d 139 (2013) ................................................. 10

*Scotto v. Almenas,*
143 F.3d 105 (2d Cir. 1998) ................................................. 1

*Simplexdiam, Inc. v. Underwriters at Lloyd's of London,*
283 A.D.2d 34 (1st Dept. 2001) ................................................. 15

*Slamrow v. Del Col,*
79 N.Y.2d 1016 (1992) ................................................. 15

*Smith & Wesson v. Birmingham Fire Insurance Co.*,
23 A.D.2d 135 (1st Dept. 1987)........................................................................ 24

*Stonewall Insurance Co. v. Asbestos Claims Management Corp.*,
73 F.3d 1178 (2d Cir.1995)............................................................................... 20

*Town of Amherst v. Hilger,*
106 A.D.3d 120 (4th Dept. 2013) ...................................................................... 24

*Union Carbide Corp. v. Affiliated FM Ins. Co.*,
101 A.D.3d 434 (1st Dept. 2012)................................................................. 21, 22

*Voelker v. John Crane, et al.*,
Erie County, Supreme Court, Index No. 801886/2013................................. 19

STATUTES

Insurance Law §3420.......................................... 1, 2, 16, 17, 18, 22, 23, 24, 25, 26, 27, 29, 30, 40

RULES

Fed R. Civ. P. 56(d) ......................................................................................... 2, 34

## PRELIMINARY STATEMENT

The opinion of the New York State Court of Appeals in *In re: Viking Pump, Inc. and Warren Pumps, LLC, Insurance Appeals* ("*Viking Pump"*), 27 N.Y.3d 244, affirms that the "all sums" rule is now the settled and controlling law of New York and should enable Mrs. Muir to collect her unsatisfied judgment of $5,856,171.85 in its entirety from the excess policies jointly issued by the Defendants Continental Insurance Company ("Continental") and Harper Insurance Limited and Assicurazioni Generali, SPA ("Harper/Assicurazioni") for policy year January 1, 1976 - January 1, 1977.

As demonstrated in the September 25, 2015, January 15, 2016 and February 26, 2016 filings supporting their summary judgment motions, the Plaintiffs (*i.e.*, Mrs. Muir and the *Mineweaser*, *Powers*, and *Peace* plaintiffs) have established their rights under Insurance Law §3420 to obtain payments for their unsatisfied filed judgments of $13,148,431.  As the moving party, Mrs. Muir has met the initial burden of demonstrating the absence of a disputed issue of material fact so the burden shifts to the nonmoving parties to present "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The Defendants, as non-moving parties, may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment.  *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998).  If the evidence favoring the nonmoving party is "merely colorable… or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1985).

In addition to the various arguments advanced by the Defendants in opposition to Plaintiff Muir's motion for summary judgment, both Continental, represented by Mendes & Mount, and Harper/Assicurazioni, now represented by Foran Glennon, take the position that summary judgment should be denied because of the alleged need for discovery.

1

Plaintiff respectfully submits that this Court should reject the Defendants' arguments made pursuant to Fed R. Civ. P. 56(d), as neither Continental nor Harper/Assicurazioni has demonstrated or can demonstrate the need for additional discovery or indeed any discovery in the *Muir* action. Neither Defendant can provide a rational explanation of how the discovery it proposes could reasonably be expected to present facts essential to justify opposition to Plaintiff's motion for summary judgment, as required by Fed. R. Civ. P. 56(d).

## ARGUMENT

## POINT I

### FOLLOWING THE DECISION OF THE NEW YORK STATE COURT OF APPEALS IN *VIKING PUMP*, "ALL SUMS" PAYMENT APPLIES TO THE DEFENDANTS' 1976-1977 EXCESS POLICY YEAR BY VERTICAL EXHAUSTION

**A.    The Plaintiffs Are Entitled To Collect Their Entire Judgments From One Annual Policy Period**

The May 3, 2016 New York State Court of Appeals decision in *Viking Pump* completely supports the Plaintiffs' position that the Defendants must pay the entirety of the four judgments from any one excess policy year because their policies cover "all sums" owed by the insured tort-feasor. The holding is in harmony with the "all sums" payment approach and the exhaustion of an entire multi-tier excess policy year for payment of long-tail asbestos claims with Insurance Law §3420 recovery obligations for the full payment for all damages falling within "the life of the policy."

The Court of Appeals addressed two certified questions from the Delaware Supreme Court in *Viking Pump*.  These questions were (1) whether "all sums" or "pro-rata" allocation applies where the excess insurance policies at issue either follow form to a non-cumulation provision or contain a non-cumulation and prior insurance provision, and (2) whether, in light of the answer to

2

the allocation question, horizontal or vertical exhaustion is required before certain upper level excess policies attach. In light of the language in the Defendants' excess policies tying their attachment point only to one specific underlying policy in effect during the same policy period as their excess policies, the Defendants' policies are triggered for payment of all sums by vertical exhaustion of all of the available coverage within the same policy period. The evidence in this litigation conclusively shows that the Defendants collectively wrote over $100,000,000 through 16 merged excess policies that cover the losses proven to have occurred during their 1976-1977 annual policy period.

**B.    For Payments Of The Plaintiffs' Judgments, The Defendants Have Merged Policy Limits That Total $20,000,000**

According to the information submitted by the Defendants, the first four levels of the Defendants' collective excess insurance policies that total $20 million were[1]:

| "Underwriters" Policy | "Harbor" Policy | Annual Limits | "Underwriters" Share | "Harbor" Share |
|---|---|---|---|---|
| 1st Excess UHL0632 | 1st Excess 119281 | $1,000,000 | $100,000 | $900,000 |
| 2nd Excess UHL0633 | 2nd Excess 11982 | $4,000,000 | $1,475,000 | $2,225,000 |
| 3rd Excess UHL0634 | 3rd Excess 11983 | $5,000,000 | $2,950,000 | $2,050,000 |
| 4th Excess UHL0635 | 4th Excess 11984 | $10,000,000 | $4,850,000 | $5,150,000 |
| | | Total: $20,000,000 | Total: $9,375,000 | Total: $1,032,500 |

---

[1] See, *e.g.*, *Mineweaser* Docket No. 124-8, Ex. I, which is a coverage chart where the "Annual Aggregate Limits" of the excess policies for the "London Companies Coverage" is set forth in consecutive vertical layers to total $101,000,000 for the 1976-1977 policy year for "Hedman Resources, Ltd." The chart is also Exhibit 12 in *Muir* Docket No. 27-1.

Under *Viking Pump*'s method of payment for long-tail asbestos claims, the *Muir* judgment of $5,856,171.85 should be paid in full from the combined limits of the Defendants' First level and Second level policies and should erode approximately $1,800,000 of the Defendants' Third level layer of the policies jointly written for the 1976-1977 policy year.

## C.     The Defendants' Policies Attach to One Scheduled Primary Policy

By the Defendants' duplicate "Schedule of Underlying Insurance" endorsement, the excess insurance contracts promise to pay all the losses for amounts in excess of the Aetna primary policy's $1,000,000 limit for the 1976-1977 policy year and/or when the primary policy is exhausted by payment of covered losses. Directly underlying the Defendants' 1976-1977 excess policy tower is one scheduled primary policy issued by Aetna with yearly limits of $1,000,000. Declaration of James J. Duggan (hereinafter, "Duggan Declaration"), *Muir* Docket 27-1, Exs. 12-13. There are no other primary policies underlying the excess policies of the Defendants other than a single Aetna policy No. 195548 with scheduled total limits of $1,000,000.  Duggan Declaration, *Muir* Docket 27-1, Ex. 9; Reply Declaration of James J. Duggan (hereinafter, "Duggan Reply Declaration"), Reply Ex. 1.

Under *Viking Pump*'s holding, there is no requirement that there be payment, let alone exhaustion, of any other primary policy other than the one Aetna policy that the Defendants together scheduled as their sole primary policy for the first layer excess policy period. Furthermore, no matter the Defendants' trite denials, Travelers unquestionably used the Aetna primary policy to make full payment of losses attributable to the 1976-1977 policy year. In fact, Continental's attorney Megan Ruesch *confirmed* that the primary policy was paid for asbestos-based losses attributable to the 1976-1977 policy year in August of 2011, more than a year before the Continental buy-back agreement in December of 2012.  Ms. Ruesch's chart made specific

4

reference to Aetna policy No. 195548 by stating that the paltry sum of $3,165.53 allegedly remained to be paid after Continental's review of the claims data for 13 years of losses. Duggan Reply Declaration, Reply Ex. 19.

The Defendants' claim that it is the Plaintiffs' burden to re-prove "exhaustion" of all of the primary limits in this litigation is meritless and without any legal authority. The Defendants have produced no evidence to show this Court that any of the Aetna primary and umbrella policies issued from 1967-1980 are still left partially unpaid and less than fully exhausted. Their fictional arguments that they are still "vociferously" disputing as "questions of fact" that the Travelers policies are not yet paid out is devoid of evidentiary support.

The Defendants' unsound claim that Aetna's "Canadian" primary policies somehow assume priority over their one scheduled underlying Aetna policy is just one glaring example of the sophistry of the Defendants' entire position in this litigation. In one of their more elliptical "defenses," the Defendants' attorneys proclaim that the Plaintiff must prove that Aetna's "Canadian line" of primary coverage should have been used to pay Hedman's asbestos losses instead of the Aetna "National" policies that did cover the losses - even though, according to them, there was never any coverage for Hedman to begin with under the Gulf & Western program. Out of the 70 pages of boiler-plate policy provisions the Defendants filed there is no particular provision cited to support the hypothetical proposition that the Aetna "Canadian" policies issued to cover accidents that occur in Canada should have covered asbestos disease cases in New York. Puhala Declaration, *Mineweaser* Docket 124-8 pp. 86-155.  Further, the Defendants do not cite Endorsement No. 35 in Aetna policy No. 195548, the non-cumulation of limits provision that demonstrates the interplay between the two Aetna policies so that both primary policies do not cover one loss.  Duggan Reply Declaration, Reply Ex. 10.  The Aetna primary policies' non-

cumulation of limits endorsement establishes that claims covered under the Canadian policy are

not covered under the Aetna Policy No. 195548.[2]

**D.      The Gulf & Western Insurance Program Lists Hedman As A Named Insured**

The excess policies' identical "Schedule of Underlying Insurance" endorsement provisions

obligate the Defendants to honor Aetna's commitment to cover the "North American operations"

of Gulf & Western's many subsidiaries engaged in, among other industrial and non-industrial

businesses, mining, including asbestos, farming and food production, motion picture production,

automobile part manufacture, machine part forging, metal production, tobacco and candy products,

commercial warehousing, music publishing and recording, paper products and book sales in the

1960s and 1970s.

In one of their filings of December 1, 2015, the Defendants admitted that the Aetna primary

policies to which their excess policies attach list "Hedman Mines" as a named insured subsidiary

of Gulf & Western.  Defendant Harper/Assicurazioni's Amended Counter-Statement of Material

Facts, *Mineweaser* Docket136, No. 23. The attorneys representing Harper/Assicurazioni in this

litigation did not produce Special Endorsement No. 57 during the process of discovery.  Instead,

this important document was buried in about 1,000 pages of policy forms constituting Exhibits F,

G, and H in their December 2, 2015 filings. But Special Endorsement No. 57 is referenced, albeit

in an otherwise virtually meaningless passage, in their Amended Counter Statement of Material

Facts:

> *The Aetna primary policy list dozens of Gulf and Western, Inc. subsidiaries but,*
> *significantly, does not list Hedman. Hedman, however is then added by Special*
> *Endorsement No. 57.*

---

[2]   On November 30, 2011, Travelers claims handler Chi Murphy explained to the Defendants that the concurrent "Canadian line" of Aetna policies were issued to Gulf & Western for statutory purposes to cover accidents that occurred in Canada.  Ms. Murphy's cogent explanation regarding the Aetna non-cumulation of limits provisions remains totally unrefuted by the Defendants.  Duggan Reply Declaration, Reply Ex. 23.

Defendant Harper/Assicurazioni's Amended Counter-Statement of Material Facts, *Mineweaser* Docket136, No. 23

Significantly, the Aetna primary policy's Special Endorsement No. 57 identifies "Hedman Mines" in an inventory that lists scores of multi-national "Subsidiaries and Affiliates" of Gulf & Western. All of the companies on this list are defined as "named insureds" in the liability insurance program for which the Defendants wrote hundreds of millions of dollars of coverage for the last three years that Hedman was a subsidiary of Gulf & Western. Duggan Reply Declaration, Reply Exs. 3 and 4.[3]

**E.    Defendants' Request That The Court Apply Pro-Rata Allocation For The Plaintiffs' Judgments Should Be Denied**

Read together with New York's Insurance Law direct action statute's enforcement provisions, the *Viking Pump* rulings enable Mrs. Muir to select the block of layered excess policies issued for the 1976-1977 annual term with total limits of $100,000,000 and tap the lower layer excess policies of the Defendants for the full payment of her judgment until the entire amount of her judgment is satisfied. It logically follows that the first $20,000,000 in the merged vertically-integrated excess policies which the Defendants issued should pay for the Plaintiffs' judgments consistent with the all sums payment principles applicable to excess policies under New York law.

In their many filings, Defendants argue entitlement to an automatic horizontal exhaustion formula to drastically reduce the Plaintiffs' judgments, adamantly maintaining that pro-rata allocation applies to all claims involving multi-year injuries. They repeatedly demanded that the

---

[3] Other Canadian companies listed on Special Endorsement No. 57 include: Gulf & Western Canada Ltd., Paramount Pictures Corp. (Canada) Ltd., Quebec Iron & Titanium Corp., Simon & Schuster of Canada Ltd., and Taylor Forge Canada Ltd. As pointed out in prior submissions, the Defendants continue to mislead the Court by designating the Gulf & Western Industries, Inc. insurance program as if actually issued to "Gulf & Western (US)." The Aetna primary and the Defendants' excess policies all specifically identify "Gulf & Western Industries, Inc." as the listed insured or assured. No policies issued from any of the Defendants ever designated Gulf & Western (US) or Gulf & Western (Canada) as the listed insured. The Aetna Canadian policy for 1976-1977 was issued to Gulf & Western, Inc. as the listed insured at Gulf & Western Plaza, New York, New York. Duggan Reply Declaration, Reply Ex. 9.

Durez judgments be paid through a decades-long horizontal spread by floating, for example, the following formula to minimize their payment obligations:

> Thus, the Insurers apply a 47-year allocation for the *Mineweaser* Judgment. Accordingly, if coverage was available for the *Mineweaser* judgment, under New York law each policy year across the spread period would be responsible for $ 63,830 of the Judgment ($3,000,000 / 47).
>
> ***
>
> Likewise, Continental only issued one first layer excess policy during the applicable spread period (1976-1997), which assumes 90% of a co-insured policy period) and, as such, could only be responsible for $54,447 of the Mineweaser Judgment ($63,830*90%).
>
> Defendants' Memorandum of Law, *Mineweaser* Docket 134, p. 32-33.

Continental acknowledges issuing a "first layer excess policy" during the applicable annual period of 1976-1977, *i.e.* Continental excess policy No. 11982 which shared limits and coverage with the "Underwriters" $1,000,000 policy No. 0632. Continuing vertically, the Defendants' Second level merged limits of $4,000,000 follow the First level. The Third level merged limits of $5,000,000 follow the Second and so on up to the $100,000,000 ceiling. All of the Defendants' policies promise to pay "all sums" up to the "stated limits" of a particular layer of coverage for an annual term.

The Defendants appear to claim throughout their most recent submissions of July 22, 2016, that *Viking Pump* supports their pro-rata horizontal exhaustion arguments or simply does not apply to them at all. Without withdrawing any of their prior filings, the Defendants argue that their excess policies' terms still provide them permanent insulation from the Plaintiffs' direct action rights and that pro-rata allocation should be applied by this Court by requiring the Plaintiff to gain payment from prior policies. And even though the fundamental principle of all sums payment is that the selected insurer cannot evade coverage because other insurers have a mutual coverage obligation, the Defendants maintain that they may reduce their own policy limits by payments from other

unidentified insurers that cover prior policy periods during which Mr. Muir was exposed to Hedman's poisonous fiber.

Continental's attorneys continue to ask this Court to apply a pro-rata method in calculating their obligations to pay the Plaintiffs' judgments, even though *Viking Pump*'s entire purpose is to allow attribution of all damages to a chosen policy period and to vertically exhaust the policies that issued coverage for that period. According to them, the creditors must still gain recovery from unidentified earlier insurers to reach policies in later periods. The disjointed result that the Defendants propose manifestly clashes with the all sums method that makes excess insurers jointly and severally liable to pay the Plaintiffs' judgments by vertical exhaustion upwards through the tower of coverage.

*Viking Pump* holds "[p]ro rata allocation is a legal fiction designed to treat continuous and indivisible injuries as distinct in each policy period… despite the fact that the injuries may not actually be capable of being confined to specific time periods." *Viking Pump* at 261. The Defendants' most recent method to eliminate any payment obligation on their part cannot be squared with *Viking Pump*'s endorsement of all sums payment and vertical exhaustion and rejection of the Defendants pro-rata horizontal payment theory. As now dictated by the Defendants' attorneys, forcing Mrs. Muir and the other Plaintiffs to begin the recovery of their judgments from the earliest excess policy year's tower of Hedman's coverage and then pursue multiple insurers is not "conceptually consistent with an all sums allocation" because it does not "permi[t] the Insured to seek coverage through the layers of insurance available *for a specific year*." *Id.* at 265. (emphasis added). The Defendants' interpretation of the *Viking Pump* decision makes it impossible for the Plaintiffs to select any particular policy period to recover their

judgments and would instead force them to continue to chase around multiple insurers under multiple policy periods to obtain full payment.

Still claiming that the Plaintiffs cannot "prove" that they were injured by their exposure to Hedman's fiber at the Durez plant, the Defendants continue to recycle the same cases, including a 2013 case, *Roman Catholic Diocese of Brooklyn vs National Union Fire Insurance Co.,* 21 N.Y.3d 139 (2013), which are all premised on pro-rata allocation with *multiple* occurrences, each of which required the exhaustion of an underlying primary policy. *Continental Cas. Co. v. Employers Ins. Co. of Warsaw* 60 A.D. 3d 128 (1st Dept. 2008), misinterpreted yet again by the Defendants, is a pro-rata horizontal exhaustion decision involving different types of policies and a totally different claims scenario. These cases have no application to the Plaintiffs' direct action cases, when *Viking Pump* has rejected pro-rata allocation formulas as no longer applicable for long-tail asbestos claims involving excess insurance.

The Defendants' attorneys also appear to argue that other insurers must pay the *Muir* loss, apparently through prior years' excess policies issued by their clients Seaton Insurance Company and/or One Beacon Insurance Company and/or the Aetna primary policies. In direct contradiction to this theory, the Court of Appeals approves all sums and vertical exhaustion methodology for excess insurance, ruling that a single year's higher-level policies should be exhausted before a prior year's primary or lower-level excess policy pays for long-tail asbestos-related personal injury claims. The concept of vertical exhaustion is that there be "access [to] each excess policy once the immediately underlying policies' limits are depleted, even if other lower-level policies during different policy periods remain unexhausted." *Viking Pump* at 265. By holding that pro-rata allocation does not apply to insurance contracts like the ones between the Defendants and Hedman,

and by adopting vertical rather than horizontal exhaustion, *Viking Pump* shuts down the Defendants' already meritless argument.

**F.    The Excess Policies Are Not Reduced Since The Stacking Of Multi-Year Policy Limits Is Not An Issue For Payment Of The Durez Judgments**

The Court of Appeals found that the purpose of a non-cumulation provision is to "prevent stacking, the situation in which an insured who has suffered a long term or continuous loss which has triggered coverage across more than one policy period…wishes to add together the maximum limits of all consecutive policies that have been in place during the period of loss." *Viking Pump* at 259. However, the issue of "stacking" of the Defendants' policies is simply not part of this litigation.

Seemingly arguing for the enforcement of their excess policies' non-cumulation clauses, the Defendants next argument regarding the applicability of anti-stacking provisions is misleading at best. Certainly, in the proper circumstances, the operation of non-cumulation provisions restricts an insurer's obligation to pay one policy limit for a single occurrence loss where several policies are issued by the same insurer for consecutive years. The Defendants' non-cumulation provisions might reduce their excess policy limits but only if a singular occurrence exceeds the total limits of any one triggered policy year and there is a claim made to mount up a subsequent year's limits to pay the difference. For example, if the Defendants' annual limits for the 1976-1977 policy year were only $5,000,000, Mrs. Muir could not stack the next year's limits of $5,000,000 to increase the coverage limits to $10,000,000 in order for the Defendants' to pay her entire judgment of $5,856,171.85. If this was the situation, the insurers' liability limits under the second policy would be reduced and the recovery from both excess policies would be limited to $5,000,000. However, in this litigation, the Defendants' 1976-1977 policy year vertical tower has $100,000,000 in total

11

limits – more than sufficient to pay the four pending judgments – so there is no realistic need for stacking policies for the payment of additional limits.

The Defendants' anti-stacking provisions state that the total "sums" of the Defendants' excess policies limits can be reduced by "amounts due" for payment of a specific loss, when such "amounts due" are paid by excess policies issued by the same insurers. In order for these provisions to apply at all, there must be proof that prior excess policy funds (not primary policy funds) from Continental and Harper/Assicurazioni were actually used to pay for a specific loss to a specific claimant based upon "the same occurrence" so that a double recovery does not occur. Since the Defendants are the very excess insurers that have refused to pay the Plaintiffs' claims and will not do so until ordered by this Court, the non-cumulation provisions do not reduce the limits from the 1976-1977 excess coverage block.

Both of the decisions cited in *Viking Pump* that reduce insurer liability were based upon non-cumulation clauses that involve successive year policies issued by the *same* insurer. *Id.* at 259 (citing *Nesmith v. Allstate Ins. Co.,* 24 N.Y.3d 520, 523 (4th Dept. 2014); *Hiraldo v. Allstate Ins. Co.,* 5 N.Y.3d 508, 513 (4th Dept. 2015)). These lead paint cases involved claims where the total amount sought by the claimants was more than the limits of one year's coverage—a classic case of stacking. This type of stacking of limits is disallowed when two successive year policies issued by the same company cover the same occurrence – a scenario that clearly does not apply to the Defendants' 1976-1977 excess policies in general and to the *Muir* case in particular.

The very recent decision in *Liberty Mutual v. The Fairbanks Co.,* 17 F.Supp.3d 385 (SDNY 2014), illustrates how the Defendants' arguments are unavailing to reduce their obligation to pay the entire *Muir* judgment on an all sums basis. *See*, Duggan Reply Declaration, Reply Ex. 25. First, Judge Koeltl granted the insured's motion for reconsideration of an earlier decision where a

12

pro-rata/horizontal exhaustion formula was applied for excess coverage for long-tail asbestos claims to limit multi-year coverage for an asbestos supplier. Recognizing that the *Viking Pump* decision is an "intervening change in the law," the Court ruled that all sums and vertical exhaustion should be applied for the payment of claims on an individual basis for occurrence-based policies. The *Fairbanks* decision also rejects the insurers' suggestion that excess coverage limits are necessarily reduced by payment of other claims or by other prior insurers.   In finding that there is "substantial ambiguity" in the insurer's non-cumulation of limits clause, the Court refused to reduce the limits of any of the excess insurer's consecutive years of policies, recognizing that *Viking Pump* disallows stacking and reduces limits only for subsequent year insurance issued by the same insurer where a claim is actually paid. *Viking Pump* at 259.  This Court should also reject Continental's argument for any reduction of their limits since the circumstances recognized by *Viking Pump* that might theoretically limit the Defendant's obligation to pay the *Muir* judgment on an all sums/vertical exhaustion basis do not exist.

## G.     Harper/Assicurazioni's "Self-Allocation" Formula Violates The All Sums Doctrine And The Stated Limits Terms Of Their Excess Policies

While apparently conceding that application of *Viking Pump* by this Court should allow the "spiking" by vertical exhaustion of all of the excess policies for the 1976-1977 policy year, the Harper/Assicurazioni Defendants take a different tack than Continental. Acknowledging that vertical exhaustion means payment from lower level excess policies until full payment is made into the stated limits of higher levels, Harper/Assicurazioni used up six pages in their latest submission in upside-down, unreadable calculations to try to convince the Court to ignore the stated limits of their policies – without ever mentioning that their policies' stated limits are

$1,000,000, $4,000,000, $5,000,000, and $10,000,000 for the first four levels of excess layers for the 1976-1977 year.[4]

Admitting that the total limits available to pay the judgments are at least $30,000,000 for the chosen policy year, the Defendants' calculations do not mention the share that Continental owes the "Underwriters" (or vice versa) in the First, Second, Third or Fourth level excess merged policies, or for that matter, which anonymous individuals or syndicate entities should pay the shares that they calculate they should not. The Harper/Assicurazioni Defendants wrongly claim to have some special kind of coverage to which normal rules of construction do not apply and plain words do not mean what they say so that, by their self-reducing, pro-rata allocation approach, the policies' SUM INSURED stated limit cannot apply. These Defendants contend that the Court should waste its time playing their shell game to divide up the payment by applying a self-allocation formula to drastically reduce the "SUM INSURED." This argument violates the *Viking Pump* doctrine, the policy language and public policy. Certainly, *Viking Pump* does not require the creditors to choose a policy year to minimize their recovery.

The Defendants' argument that the Court reduce the limits to a *de minimus* level for payment to the creditors is flatly contradicted by the terms of their own policies. The "Companies Collective Policy" Excess Broad Form Liability Insurance contracts explicitly sets forth that each of the enumerated "Underwriters" policies' limits are:

---

[4] In this litigation, except for Continental's first level excess policy No. 119281, Mendes & Mount have not produced the Continental excess policies No. 119282, 119283, 119284 and 119285 despite specific reference to the higher level Continental policies in their submissions to the Court of July 22, 2016. Nor have they produced the primary Aetna policies to which the Continental policies attach. Mendes & Mount did not disclose Endorsement No. 57 in discovery nor was any reference to Endorsement No. 57 made in any of their filings in this litigation despite the clear significance of this particular insurance document's listing of Hedman as a named-insured under the Aetna primary policy to which their excess policies attach. As is typical of their "deny everything, admit nothing" tactics, they resort to the use of the appellation of "*alleged Continental Policy(ies),*" in their July 22, 2016 submissions. *Muir* Docket 32 p. 26 and 28.

Policy No. 0632…………. SUM INSURED:    $1,000,000 any one occurrence

Policy No. 0633…………. SUM INSURED:    $4,000,000 any one occurrence

Policy No. 0634…………. SUM INSURED:    $5,000,000 any one occurrence

Policy No. 0635…………. SUM INSURED:    $10,000,000 any one occurrence[5]

As the New York State Court of Appeals succinctly put it, "the best evidence of what parties intend is what they say in their writing." *Slamrow v. Del Col*, 79 N.Y.2d 1016 (1992). It is black letter law that insurance contracts should *not* be read in a manner that would render the promise to provide coverage illusory and chisel to nothing the stated limits for the policies at issue. *Simplexdiam, Inc. v. Underwriters at Lloyd's of London*, 283 A.D.2d 34, 38 (1st Dept. 2001); *Lawyers Fund v. Bank Leumi Trust*, 94 N.Y.2d 398 (2000) (stating that superfluous language in a contract is unsupportable under standard principles of contract interpretation).

The Defendants' contractual specifications that their payment limits are in the amounts stated do not imply that a contrary construction of contractual provisions can be applied 40 years later. *See*, *Mastrocovo v. Capizzi* 87 A.D.3rd 1296, 1298 (4th Dept. 2012) (citing *Matter of New York City Asbestos Litigation*, 41 A.D.3rd 299, 302); *see also*, *John Doris, Inc. v. Solomon R. Guggenheim Foundation*, 209 A.D.2d 380, 380 (2d Dept. 1994) (concluding that when the language of a contract is clear and unambiguous, "courts may not rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous"). Nowhere in the Defendants' excess broad form liability policy provisions is there any indication that the "SUM INSURED" is actually less than the amounts stated on the face of the policy. The Defendants offer no authority for their argument that their policies' stated limits, 40 years after they were written, are actually much less than clearly and unambiguously stated - now that it is time to pay out. The

---

[5] The Title of the "Underwriters" Policy No. 0632 is COMPANIES COLLECTIVE POLICY. The term SUM INSURED is also capitalized in all the "Underwriters" excess policies. Duggan Reply Declaration, Reply Ex. 4.

Defendants' reverse self-allocation computations, designed to "vitiate" their stated policy limits, are precisely what the all sums doctrine was designed to prevent and should be rejected out of hand.

The Defendants' latest calculations are just more warmed-over pro-rata theory, based upon the same misdirected script to try to eliminate their obligation to satisfy judgments fully recoverable under the direct action authority of Insurance Law §3420. At bottom, the Defendants still cling fast to the same flawed and self-serving pro-rata/horizontal exhaustion payment methods which *Viking Pump* rejects, obviously still seeking to do the very thing that their all sums payment obligation prohibits: avoid paying for covered losses by pointing the finger at other insurers issuing excess policies prior to or within their own 1976-1977 policies.  Given their own apparent internal conflicts of interest the Defendants may have the right, after the Plaintiffs' judgments are paid, to spread their payments between and among other insurer entities as they see fit. Continental and the "Underwriters" are theoretically entitled to pursue recovery from each other in order to spread the payment burden among themselves. And, of course, the Defendants can pursue their insured Hedman to recover the funds they so recklessly gave away in 2012. But the Court of Appeals holding is firm that vertical exhaustion is consistent with the all sums method for excess insurance payment for multi-year losses.

## POINT II

**THE DEFENDANTS' BUY-BACK AGREEMENTS ARE NO DEFENSE TO INSURANCE LAW § 3420 ENFORCEMENT RIGHTS AND THE DEFENDANTS ARE ESTOPPED FROM DENYING THAT THEIR EXCESS POLICIES COVER HEDMAN FOR ASBESTOS-RELATED CLAIMS**

The Plaintiffs established that the Defendants collectively wrote $100,000,000 in annual excess policies for Hedman's asbestos liability and allowed Hedman to default in four cases in the

New York State Supreme Court where four judgments remain unsatisfied. The May 3, 2016 rulings from the Court of Appeals resolve the issues of whether the Defendants, through the policies they jointly issued, must pay "all-sums" necessary to satisfy the Durez families' asbestos-related judgments vertically from a single year's tiered coverage or through payment by a pro-rata and horizontal allocation method. Properly applied in this litigation, the *Viking Pump* rulings clearly require payment from the annual vertical layers of excess policy coverage based on the identical policy language contained in the Defendants' policies. The Court of Appeals decision in *Viking Pump* firmly rejects the Defendants' push for a multi-year allocation scheme to eliminate their statutory responsibility to pay the entire amount of each of the Plaintiffs' judgments from one excess policy year on an "all sums" basis. The result prescribed is in harmony with the statutory authority of Insurance Law §3420 authorizing judgment creditors' full recovery of damages that occur during the life of an insurer's policy in direct action litigation. Striving to avert summary judgment, their mis-labeling of *Viking Pump* as "strictly limited" and "very narrow" and Insurance Law §3420 as an "extremely limited cause of action" only demonstrates that the Defendants remain in denial regarding the consequences of their illegal buy-back payments in this litigation. Defendant Continental's Memorandum of Law in Opposition, *Muir* Docket 32, pp. 1 and 17.

**A.     The Defendants Must Pay All Sums Caused By Occurrences During Their Policies**

The applicable New York statutory provisions for direct action relief in this litigation allow the judgment creditors to recover from any and all of the Defendants' layered policies up to their stated monetary limits for "all sums" when the injury sustained is "occasioned during the life of the policy." Insurance Law § 3420(b)(1) states:

> any person who, or the personal representative of any person who, has obtained a judgment against the insured or the insured's personal representative for damages for injury sustained or loss or damage occasioned during the life of the policy or contract.

Since Hedman's New York creditors have the statutory right to recover their judgments up to the limits of the Defendants' policies when any given policy covers the occurrence and damages, the Plaintiffs are entitled to be paid by Hedman's excess insurers from all the excess policies from 1968-1979. The term "during the life of the policy" in Insurance Law §3420(b)(1) simply means that the insured's liability for the damages be attributable to injuries that occur during the insurer's annual policy period.

Under New York insurance coverage law, all the excess policies from 1968-1979 are triggered from the date of a worker's first exposure to Hedman's fiber through the last exposure — in Mr. Muir's case he was exposed continuously to Hedman's toxic product from 1970 through 1977. Under the "all sums" method, the judgment creditors collect all of their damages "under any policy in effect during the periods that the damage occurred, up to the policy limits." *Viking Pump* at 255. So long as an excess insurer's policy is triggered for payment of "all sums" for the damages that arise during a policy period, the creditor can select and recover from that insurer the amounts owed under a judgment against the defaulting insured, up to the annual policy limits, regardless of whether the damage or exposure also occurred in prior or subsequent policy periods. Consequently, the judgment creditors in this litigation need not gain payment from the other liable excess insurers in order to exercise their prerogative to gain full payment of their judgments from the Defendant(s) of their choosing. Given the synonymous meanings of the terms, the Plaintiffs can choose which insurer(s) from whom to gain payment for "all sums" owed under the direct action provisions of Insurance Law §3420 for losses that occur "during the life of the policy."

The Defendants continue to misstate the facts and misapply the law regarding their responsibility under Insurance Law §3420(a)(2) by arguing that the Plaintiffs' claims must fail because of a supposed inability to prove that their injuries occurred during the Defendants'

18

respective policy periods despite the New York State Supreme Court decisions to the contrary. Their entire argument depends on their unsupportable theory that the date of a victim's mesothelioma diagnosis after their buyback arrangements with their insured Hedman bars any claim to activate their policy for coverage or for direct action recovery. According to the Defendants' theory of immunity, Mrs. Muir cannot exercise her direct action rights against them because her husband's mesothelioma diagnosis in 2014 occurred after the Defendants' buy-back agreements with Hedman in 2012. Notwithstanding their contrarian but unsustainable views, established New York jurisprudence has long determined that exposure to a hazardous substance during the term of an occurrence-based liability policy triggers the coverage for long-tail coverage claims. Injury-in-fact takes place during the period of time when the claimant inhales asbestos fibers and the triggering of the occurrence is the victim's exposure to a toxic substance and not the point of manifestation of the victim's latent disease. *See*, Plaintiff's Memorandum of Law, *Mineweaser* Docket 142-8 p. 17-20; *see also*, *Consorti v. Owens-Corning Fiberglas Corp.*, 86 N.Y.2d 449 (1995).

New York law is clear that the time of the victim's exposure to the toxic agent is the controlling factor for an asbestos-supplier's liability and not the time of the manifestation of the disease. By Justice Chimes' verdict in *Muir*, Hedman was proven liable for negligently exposing Mr. Muir to asbestos fiber in the 1970s when the Defendants' policies were in effect. In a case previously cited, *Voelker v. John Crane, et al.*, Erie County, Supreme Court, Index No. 801886/2013, still without a coherent response from the Defendants, Justice Chimes also ruled that the triggering event for an asbestos supplier's liability is the time when the victim is exposed to the tort-feasor's asbestos. Second Reply Declaration of James J. Duggan, *Mineweaser* Docket 149-2, Second Reply Ex. 2.

Further, New York law on the activation of insurance coverage for long-tail asbestos claims is firmly entrenched. When the occurrence is continuous over a multi-year policy span, the tort victims have sustained damages during each policy year throughout the entire period of coverage. *American Home Products Corp. v. Liberty Mutual Insurance Co.*, 748 F.2d 760 (2d Cir. 1984); *Continental Casualty Co. v. Rapid-American Corp.*, 80 N.Y.2d 640 (1993); *Matter of Midland Insurance Co.,* 269 A.D.2d 50 (1ˢᵗ Dept. 2000); *Stonewall Insurance Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178 (2d Cir.1995).

Likewise, there is no basis for Defendants' argument that Hedman's liability, as determined by Justice Chimes in *Muir*, arose from intentional acts that do not qualify as covered occurrences.  Although the only case cited by the Defendants for this argument, *Consolidated Edison v. Allstate Ins. Co.*, 98 N.Y.2d 208 (2002) arises from entirely different facts, the rationale in the decision clarifies why the Defendants' policies provide coverage for the negligence verdict against Hedman. In *Consolidated Edison*, the insured sought coverage in connection with an underlying claim regarding the sale of real property. After a jury determination that the contamination was expected and intended and did not the result from an accident, coverage litigation ensued regarding the burden of proving the insurer's exclusionary provisions.  In stark contrast to *Consolidated Edison*, there was no indication in the *Muir* verdict that mesothelioma was expected or intended by Hedman when asbestos fiber was sold to the Durez plant. Quite the opposite, Justice Chimes determined that Mr. Muir's disease was caused by Hedman's negligence alone and the findings are the final disposition in the underlying action as the law of the case which dispositively establishes coverage under Defendants' policies.  *See, City of Johnstown v Bankers Std. Ins. Co.*, 877 F.2d 1146, 1150 (2d Cir. 1989) (stating that neither ordinary negligence nor a calculated risk amount to an expectation of damage constitutes an intention to cause damage).

Under *Consolidated Edison*, "[o]nce coverage is established, the insurer bears the burden of proving that an exclusion applies." *Consolidated Edison* at 220.  Since the Defendants have not proffered any evidence to show that these claims somehow fall outside of coverage, their Hail Mary type of argument should be rejected.

Prevailing case law in the asbestos insurance coverage litigation context further confirms that the trial judgments are covered by Defendants' policies. *See*, *Continental Casualty Co. v. Rapid-American Corp.*, 80 N.Y.2d 640 (1993); *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 101 A.D.3d 434 (1st Dept. 2012).  In *Continental Casualty*, the Court of Appeals rejected the same argument asserted by Defendants, deciding that by their nature asbestos claims were not expected or intentional acts by insureds.  The insurers alleged that punitive damage judgments estopped the insured from denying the intentional nature of the damage caused to claimants. The Court of Appeals instead found in favor of coverage, determining that the insured was not a party to any of the punitive damages judgments and that the insured's negligence did not equate to expected or intended conduct, stating:

> Resulting damage can be unintended even though the act leading to the damage was intentional.  A person may engage in behavior that involves a calculated risk without expecting that an accident will occur — in fact, people often seek insurance for just such circumstances.

> *Continental Casualty Co.* at 649.

Unlike *Continental Casualty*, punitive damages and intentional conduct are simply not at issue in Durez asbestos litigation and Defendants clearly owe coverage.

In *Union Carbide*, the Appellate Division similarly held that the insured was entitled to coverage under its insurer's occurrence-based policy for asbestos claims against the asbestos-supplier tort-feasor. Citing *Consolidated Edison*, the court concluded:

21

> Defendants [plaintiff's insurers] asserted that plaintiff [insured] intended the damages because it knew that asbestos would cause injuries and that claims would be filed against it. The record, however, shows that plaintiff was merely aware that asbestos could cause injuries and that claims could be filed. Plaintiff's 'calculated risk' in manufacturing and selling its products despite its awareness of possible injuries and claims does not amount to an expectation of damage.

> *Union Carbide*, 101 A.D.3d at 435.

Like *Union Carbide*, there are no findings of expected or intended injuries in the *Muir* verdict. Justice Chimes' findings were based on common law negligence and failure to warn of the hazards of asbestos exposure. Defendants' attempt to distort the verdict's findings into something wholly different is without merit, and there is no legitimate question whether the claims at issue constitute covered occurrences. The Supreme Court's determination that Hedman committed negligence is covered under their occurrence-based policies and Defendants are collaterally estopped from exhuming the issue.

## B.    The Defendants' Buy-Back Agreements Are No Defense To The Plaintiffs' Insurance Law §3420 Claims

As established in prior submissions in detail, the record establishes that the Defendants' furtive and cynical decision to "cut and run" and pay off Hedman was done without Court supervision, without notice to Hedman's creditors and with no safeguards whatsoever as to how the funds were to be used. In their secret buy-back agreements, the Defendants made no provision that asbestos victim claimants and creditors would be paid from the "settlement" funds and allocated none of the cash they paid Hedman for asbestos claims, nor did they advise any asbestos claimant or attorney about the transfer of the funds until October of 2013. The Defendants' unprecedented attempt to manipulate their contractual statutory obligations out of existence by paying out cash to a defunct corporation facing thousands of serious tort claims, made many years after their contracts were written, is a flagrant derogation of Insurance Law §3420's requirements

that disallows insurers from avoiding paying judgments by secret payments to the tort-feasors instead of to the tort-feasors' victims. Without violating the statute's prohibitions, the Defendants cannot retroactively write off their defense and indemnity obligations leaving Hedman without hundreds of millions of dollars in insurance assets and its creditors unable to collect their judgments. [6]

The Defendants still apparently maintain, with no authority, that their buy-back agreements with Hedman legally bind the Plaintiffs to eliminate all the creditors' statutory recovery claims against their policies. The Plaintiffs have previously demonstrated in great detail that the Defendants' leaden "stand in the shoes" defense, based upon their secret cash payments to Hedman, is in no way a bar to the judgment holders' Insurance Law §3420 direct action recovery rights against them. The Plaintiffs' submissions on summary judgment established that the Defendants' buy-back defense immunity arguments have no legal effect on Insurance Law §3420 enforcement rights for direct payment of the judgments. Since there is no authority supporting the Defendants' argument that their buy-back scenario serves to bar statutory direct action rights, the determination in *Viking Pump* effectively eliminates the last of the so-called "coverage defenses" that the Defendants claim still present questions of fact to prevent this Court from granting summary judgment to the Plaintiffs.

---

[6] The 1976-1977 year Defendants are guilty of direct contravention of the prohibitions of Debtor Creditor Law § 273-a. as established in the pending motion for summary judgment set for argument on August 30, 2016 in *Mineweaser*. These Defendants' policy buy-back transactions, where $1,247,574 was paid to Hedman, were made after the *Mineweaser* lawsuit was initiated in November 2012. The Defendants claims representatives and lawyers were notified about the filing of the *Mineweaser* complaint by Hedman's defense attorney before they paid off Hedman by wiring their cash to a bank account in Spain. The Harper/Assicurazioni agreement was signed by Hedman on November 22, 2012 and the Continental agreement was signed by Hedman on December 31, 2012.  *Mineweaser* Docket 118-1 Ex 99 and 102. The Defendants unquestionably received notice of *Mineweaser* before transferring their pay-off money to Hedman to Spain.

Undeterred, the Defendants still unabashedly ask this Court to grant them immunity from the statutory financial consequences of the buy-back agreements made without Hedman's tort victims and judgment creditors' knowledge or consent. Even though the Defendants admit that the purpose for their paying millions of dollars to Hedman instead of to Hedman's victims was to try to extinguish their obligations to pay claims under their insurance policies to the victims, they persist in their "stand in the shoes" arguments. Collusive insurance deals, like the buy-back agreements here, should not be allowed to defeat the rights of judgment creditors to recover by direct suit against the insurers who engage in this type of conduct. As previously cited, an insurer and its policyholder cannot agree to nullify the beneficent effects of Insurance Law §3420 by illegal releases that try to cut out tort-victims from the insurance payments which are designed to go to them rather than to the tort-feasor. The Defendants have failed to address the cases which void collusive settlements made by insurers trying to avoid paying injured claimants under §3420, e.g., *Frison Corp v. Lumberman's Mutual Cas. Co.,* 645 N.Y.S. 2d 230 (4th Dept. 1996); *Arida v. Essex Insurance Co*., 750 N.Y.S. 2d 725 (4th Dept. 2002); *Smith & Wesson v. Birmingham Fire Insurance Co.*, 23 A.D.2d 135 (1st Dept. 1987). *See*, Plaintiff's Memorandum of Law *Mineweaser* Docket 118-3 p. 20-24.

New York case law disallows schemes, described as "settlements," which are purposefully designed to block the recovery of the proceeds from insurance policies written to indemnify the victims of the torts of an insured debtor. The purpose of direct action provisions, and the law requiring their enforcement, is to prevent the working of a substantial injustice to the judgment creditors that have claims against insolvent and non-paying insureds. The Appellate Division, Fourth Department's Insurance Law §3420 decision in *Town of Amherst v. Hilger,* 106 A.D.3d 120 (4th Dept. 2013), outlawed as irrational a similar agreement between an insurer and its

insureds designed to block creditors from recovery of personal injury judgments. Evasive arrangements like the Defendants' cash payouts to Hedman are disallowed in favor of the recovery of the legitimate judgments of blameless creditors through the enforcement provisions of Insurance Law §3420. The Defendants have yet to provide meaningful authority to the contrary.

**C.      The Defendants Cannot Litigate "Coverage Defenses" In A Direct Action Case**

Since the Defendants claim that they settled all the "disputed" coverage issues with Hedman, they cannot now return to litigate these issues all over again with Hedman's judgment creditors. Having chosen to try to eliminate the contracts of insurance so as to avoid their Insurance Law §3420 obligations to the creditors, the Defendants do not get a second opportunity to try to escape or negate their contractual obligations. The Defendants had over six years to dispute Hedman's coverage rights and are estopped from further attempts to re-litigate immaterial, meritless, extraneous or non-existent "coverage" issues involving Hedman's status as an insured under the excess policies they issued for Gulf & Western's subsidiaries. Having enabled Hedman to default in consecutive trials, Hedman's excess insurers can no longer evade their statutory obligations to pay the unsatisfied judgments pursuant to Insurance Law § 3420. *See*, *Lang v. Hanover Insurance Co.*, 3 N.Y.3d 350 (N.Y. 2004). *See also*, Plaintiff's Memorandum of Law, *Mineweaser* Docket 118-3, p. 10-24.

Under New York Law, it is of no legal consequence that the Defendants still complain that the Plaintiffs failed to meet their "burden" to prove the "full and fair" exhaustion of Gulf & Western's primary policies, or that Hedman is really their insured after all in order to overcome their meritless coverage "defenses" and excuses. The Defendants have no answer to the New York case law which prohibits insurance companies from re-litigating issues of liability, damages and insurance coverage in direct action recovery cases except for the propriety of disclaimers. As the

Fourth Department concluded in *Bowker v. New York State Insurance Fund*, 39 A.D.3d 1162 (4th

Dept. 2007),

> SIF took that risk here, and SIF therefore "may litigate only the validity of its
> disclaimer and cannot challenge the liability or damages determination in the
> underlying [case]."

> 39 A.D.3d 1162 (4th Dept. 2007) (*citing Lang, supra*).

*See also, Republic Franklin Ins. Co. v. Pistilli,* 16 A.D.3d 477 (2d Dept. 2005)

Here the Defendants recklessly gambled and lost since, not surprisingly, Hedman never

used any of their funds to pay any personal injury claims or judgments.  The Defendants cannot

now belatedly litigate these issues all over again with Hedman's judgment creditors since they

never disclaimed coverage based upon concealment, cancelling the policy or any of the other bogus

arguments used by Defendants to try to escape their responsibility to pay the Plaintiffs. The

Defendants' endless strategy of obstruction and delay should be called to a halt so that the

judgments are paid off during the lifetimes of the survivors of the Durez victims.

Though required under New York insurance statutes, the Defendants offer no proof that

there was ever a proper disclaimer of coverage sent to Hedman or the claimants. *Mineweaser*

Docket 142-9, Reply ¶47. New York Insurance Law §3420(d) requires that when a liability policy

is "delivered or issued for delivery in this state, [if] an insurer shall disclaim liability or deny

coverage for death or bodily injury… it shall give written notice as soon as is reasonably possible."

In the 1970s, Gulf & Western Industries' corporate headquarters was located at Gulf & Western

Plaza in New York City and among the risks insured was the products liability of Hedman for

selling asbestos in Western New York.  A policy is "issued for delivery" in New York if it covers

both the insureds and the risks located in this State even if the policies are written by an out of

state insurance company. *See*, *Columbia Cas. Co. v. National Emergency Servs*., 282 A.D.2d 346,

347 (1ˢᵗ Dept. 2001); *see also*, *American Ref-Fuel Co. of Hempstead v. Employers Ins. Co. of Wausau,* 265 A.D.2d 49, 53 (2d Dept. 2000).  (Policies delivered to Texas but risk was in New York - §3420 applies). The Defendants' policies obviously cover risks located in New York since their coverage encompasses risks throughout North America. Exhibits to Declaration of James J. Duggan, *Muir* Docket 27-6, p. 9 and 39. Because their policies were "issued for delivery" in New York, the Defendants are required by Insurance Law §3420 (d) to make timely disclaimer of coverage and failed to do so before their 2012 payments to Hedman.[7]

**D.    The Defendants Accepted That Hedman Was Covered Under The Gulf & Western Insurance Program**

As a subsidiary of Gulf & Western, Hedman was defended and indemnified as a fully qualified named insured by the Aetna primary policies the Defendants scheduled as underlying their own excess policies. Hedman is specifically listed by name as one of the hundreds of multi-operational subsidiaries of one of the largest industrial conglomerates in the United States in the 1965-1980 era.  Duggan Reply Declaration, Reply Ex. 2.

The Defendants' excess policies follow the lead of the primary policies to which they attach in order to provide coverage for the North American operations of all of the subsidiaries and affiliated companies of the listed insured, the Gulf & Western parent company. The Aetna primary policies covered Hedman as a subsidiary of Gulf & Western under the policy terms and conditions which are virtually identical to the Defendants' excess policy terms and conditions. Travelers, as the successor to the Defendants' only scheduled primary insurer Aetna, defended and settled thousands of asbestos-related cases against the named insured Hedman and paid out over

---

[7] In their July 22, 2016 submission, Mendes & Mount claims for the first time that Insurance Law §3420 does not apply at all in this litigation because some of the Gulf & Western excess policies were sold by a Texas-based wholesale insurance broker, Swett & Crawford.  The cases cited do not support this latest meritless proposition.

$17,000,000 for the defense and indemnity for Hedman from 2001-2012, including many cases for worker disease and death attributable to exposure to its asbestos at the Durez plant. As a subsidiary of Gulf & Western, Hedman qualified as a "named insured" by general and specific reference to the policy provisions and definitions of the primary policies and the Defendants' excess policies and was defended and indemnified under the same Gulf & Western insurance program for which the Defendants' collected premiums for many years.

In 2005, the record establishes that the Defendants knew that Hedman was dealing with thousands of asbestos claims throughout the United States because Hedman's coverage attorneys placed all of the excess insurer Defendants on notice of the asbestos-related claims that implicated years of their excess coverage. Harbor Insurance Co., the predecessor of Continental, was provided with specific notice by the tender of coverage from Hedman's attorney on August 1, 2005. Duggan Reply Declaration, Reply Ex. 11. The so-called "London market" Defendants were given notice of Hedman's claims for coverage of pending asbestos claims specifically on August 1, 2005 by delivery of notice to their United States broker Swett & Crawford as required under the provisions of their excess policy.[8]  Duggan Reply Declaration, Reply Ex. 12.

From 2005 through August 2011, the so-called London market Defendants did nothing to respond to the Hedman's demand for indemnity protection despite having more than sufficient

---

[8] The 1976-1979 "Underwriters" policy notice provisions state as follows at p.11:

> Item 4.   Notice of Occurrence (Condition G) to: Swett & Crawford 3 Greenway Plaza
> East, Suite 900, Houston Texas 77046

And

> Item 7.    Service of Process (Condition S) upon:  Mendes & Mount and/or their
> Nominees, 3 Park Avenue New York, New York U.S.A.

The same law firm now claiming that the excess policies were not delivered in New York back in the 1970s was the New York statutory agent for service of process for the same policies. *Muir* Docket 27-1, Ex. 11.

information to investigate the claims and resolve the now "hotly contested" coverage issues if they so choose. But from 2006-2008, Continental's claims representative acknowledged Hedman's claim for coverage as an additional insured under the Gulf & Western insurance program and did not ever disclaim coverage. Duggan Reply Declaration, Reply Exs. 13, 14, 15, 16, 17.

On August 10, 2011, Amina Ray, the Resolute Management claims representative for Continental, confirmed in a letter to her counterpart Lavern Tyner in London that the excess insurer identified as "Lloyd's of London" shared Continental's coverage for Hedman through the Gulf & Western program for the 1976-1977 policy year:

> Lloyd's of London is responsible for a significant amount of excess coverage written on behalf of G&W (approximately $68 million, at least). Presently, the only Lloyd's policy currently implicated is an umbrella policy, Policy No. 53450, providing $100,000 part of $1 million, excess of $1 million, for the policy period 1/1/76 to 1/1/77. This policy shares a layer with Harbor Policy No. 119281, which accounts for the additional $900,000 of coverage.

Duggan Reply Declaration, Reply Ex. 18.

Thus, in August of 2011, it is undisputed that the Defendants' claims representatives for the 1976 excess policies were discussing their mutual contractual responsibility to cover Hedman and to process and pay asbestos claims and had confirmed that the Aetna primary policy referred to above had been exhausted by payment of its limits. Duggan Reply Declaration, Reply Ex. 19.

Afterwards, the manner in which mesothelioma claims were handled establishes that these Defendants were fully aware of their obligations to defend and indemnify Hedman, and their own potential exposure under Insurance Law §3420 for direct action claims by plaintiffs exposed to Hedman's asbestos at the Durez plant. To illustrate how, one must look no further than the *Failing* settlement in December of 2011.

On December 7, 2011 the attorneys representing Seaton, Continental and the so-called London Companies appeared in open court in Buffalo and settled the *Failing* claim by offering

*together* to pay the unallocated sum of $300,000 on behalf of Hedman. The only "coverage" issue identified was that One Beacon was refusing to commit to pay a share to settle from its 1967-1973 excess policies.  There was no mention of a disputed coverage issue by the attorneys for the Defendants, including whether Hedman was insured or whether any of the Travelers primary policies were "fully and finally" exhausted. Duggan Declaration, *Mineweaser* Docket 118-7, Ex. 52.

In *Failing,* the attorneys now representing the so-called "London Companies," then with Riker Danzig Scherer Hyland and Perretti ("Riker Danzig"), advised the Court that the payment of $300,000 was made by Seaton, Continental and the London Companies on a joint and unallocated basis and, eventually, that Harper/Assicurazioni were the "London Companies." These same attorneys represented the so-called London Companies in negotiation and formulation of the illegal buy-back agreement where Hedman was paid to "release" policy Nos. 0632, 0633, 0634 and 0635 and continue to represent them now as the excess insurers which issued excess policy Nos. 0632, 0633, 0634 and 0635 in this litigation. Duggan Declaration, *Mineweaser* Docket 118-7, Ex. 98.

By the time of the *Failing* trial, Ford Marrin Esposito Witmeyer & Glesser, ("Ford Marrin"), the attorneys representing Continental, had confirmed that the Aetna primary policy No. 195548 made full payment of asbestos-related losses attributable to the 1976-1977 policy year. Duggan Reply Declaration, Reply Ex. 19. To settle the *Failing* case, attorneys from the Ford Marrin and Riker Danzig firms required language releasing Continental and "Harper/Assicurazioni" as the London Companies from direct action lawsuits under Insurance Law §3420(b)(1) for the excess policies they jointly issued for Hedman. *See*, Duggan Declaration, *Mineweaser* Docket 118-17, Exs. 52, 55; Docket 118-18, Ex. 56.  After the *Failing* settlement,

there was never any communication made to the Durez Plaintiffs' attorneys that Hedman was not insured under the Defendants' excess policies, that the Travelers primary policies were not exhausted, or any other communication related to any of the other excuses the Defendants now raise to try to avoid summary judgment against them. A year later, the Continental policy buy-back agreement with Hedman released Harbor Excess Policy Nos. 19281, 119282, 119283 and 119284 and was negotiated with Hedman by Ford Marrin attorneys. Duggan Declaration, *Mineweaser* Docket 118-7, Ex. 102.

In an unperfected declaratory judgment lawsuit filed regarding the *Failing* case directed against, among others, their present client Continental, Mendes & Mount represented a "London Company," Yasuda Fire and Marine Insurance Company ("Yasuda") identified as an excess insurer issuing Policy No. 0632. The declaratory judgment complaint asserted that Gulf & Western's policies were delivered in New York to the corporate headquarters at Gulf & Western Plaza. *Mineweaser* Docket 134-24. In the August 9, 2012 buy-back agreement they negotiated with Hedman, Mendes & Mount identified Yasuda as issuing excess Policy No. 0632 as part of the insurer group that gained a release for paying Hedman $1,250,000. This particular buy-back agreement states that Yasuda was selling the interests of:

> The insurance policy with policy number UHL 0632 and certificate number §3450 subscribed by the Yasuda Fire and Marine Insurance Company of Europe Limited (formerly known as the Yasuda Fire and Marine Insurance Company (UK) Limited) (hereinafter, "Yasuda") and issued for the policy period(s) from January 1, 1976 through January 1, 1977

Duggan Declaration, *Mineweaser* Docket 118-7, Ex. 88.

Despite their obvious intra-policy conflictual relationship, the documentary evidence provided by the Defendants' past and present attorneys establishes that the Defendants acknowledged coverage for Hedman and paid for the purported release of the vertically layered

31

and merged excess policies issued by Harbor and the Underwriters for the annual policy period of 1976-1977.  Their records conclusively establish that Harbor, as the predecessor of Continental, co-wrote excess Policy Nos. 19281, 119282, 119283 and 119284 jointly with "Underwriters" excess Policy Nos. 0632, 0633, 0634 and 0635 by merger of the first four layers collectively to total the first $30,000,000 in excess limits for Gulf & Western's annual year 1976-1977.  As fully explained above, these eight enumerated policies issued by the Defendants should be ordered tapped for payment of Mrs. Muir's judgment.

**POINT III**

**THE COURT SHOULD DENY THE DEFENDANTS' APPLICATION FOR ADDITIONAL DISCOVERY**

Notwithstanding their filing motions for summary judgment over a year ago with literally no discovery from their claims files or their policies, and despite the submission of voluminous filings by all parties consisting of numerous exhibits, the Defendants claim the need for discovery to respond to the *Muir* summary judgment motion.

**A.     The Defendants' Claim That They Now Need Discovery From Hedman Or TCI, Inc. Is Meritless**

Plaintiff respectfully submits that discovery is complete on the issue of "named insured" given that the facts already adduced in the earlier related Federal actions pending in this Court (*Mineweaser, Powers*, and *Peace*) conclusively establish by documentary evidence that Hedman, as a subsidiary of Gulf & Western, at all times relevant to this litigation, was entitled to coverage under the excess policies issued by the Defendants. *See*, Plaintiff's Reply to Defendant's Joint Response to Plaintiffs' Joint Statement of Material Facts, *Mineweaser*, Docket 142-9, Replies 2 and 3.  The evidence filed in all the pending motions for summary judgment scheduled for argument on August 30, 2016 overwhelmingly demonstrates that the Defendants accepted that

Hedman was fully insured as a subsidiary of Gulf & Western and the Defendants would never have paid Hedman approximately $6.25 million had they believed otherwise.

Just as discovery is complete on the issue of named insured, so is it also complete on the issue of the exhaustion of the primary coverage underlying Defendants' excess policies. The relevant facts here have also been adduced in the context of the three earlier related Federal actions. Joseph Muir's widow, Nancy, has nothing more to disclose. Indeed, the documents relevant to this issue are drawn almost entirely from the Defendants' own files.

The undisputed facts before this Court conclusively demonstrate that Hedman qualified as a named insured under the primary and excess policies issued to Gulf & Western Industries, Inc. The undisputed facts before this Court also demonstrate that the primary coverage underlying the excess policies issued by the Defendants was fully and completely exhausted, both horizontally, across the period from 1967 to 1979, and vertically for the year 1976-77, during which excess coverage was in place under policies issued by both Continental and Harper/Assicurazioni. Plaintiff's Reply to Defendant's Joint Response to Plaintiffs' Joint Statement of Material Facts, *Mineweaser* Docket 142-9, Replies 48 and 49.

Continental desires to obtain information adduced in the context of the *Chapin* action pending in Erie County State Supreme Court. For reasons already thoroughly explained, information in this case is wholly irrelevant and immaterial to the outcome of the Plaintiff's motion for summary judgment. See, Plaintiff's Response to Defendants' Additional SOMF, *Mineweaser*, Docket 142-9, Response 5.

Defendant Harper/Assicurazioni also fixates on the *Chapin* state court action. According to their Memorandum of Law, Harper/Assicurazioni "may also seek discovery from TCI, Inc., the purported successor to the assured, Gulf and Western Industries, Inc." *Muir* Docket 31 p.8. The

reason given by Harper/Assicurazioni for the need for such non-party discovery is that in "recent state court filings, TCI asserts that Hedman was not a subsidiary of Gulf and Western Industries, Inc." This purported need for discovery is based on nothing more than speculation based on the groundless assertions of a non-party to the *Muir* action. It is, in point of fact, a phony pretext for engaging in pointless discovery.

This Court should deny Defendants' requests for time to delve into the records of a large corporate entity headquartered in California merely because that company hired a law firm to assert a specious claim in another forum to being the corporate successor to Gulf & Western Industries, Inc. Plaintiff has sifted through the tens of thousands of pages of corporate records produced in this litigation by the excess carriers and by Hedman Resources, Ltd. There is not one single reference to TCI, Inc. anywhere.

Plaintiff Muir has nothing additional to offer on the issue of named insured. She has no personal knowledge or information concerning Hedman's status as a majority owned subsidiary of Gulf & Western Industries Inc., and thus additional discovery in this litigation or any discovery at all in her action would be pointless.

In support of its request pursuant to Fed. R. of Civ. P. 56(d), Harper/Assicurazioni has submitted the July 22, 2016 Affidavit of Helen Franzese, an attorney with the firm of Foran Glennon in London, England. Ms. Franzese was formerly with the London office of Riker Danzig and represented Harper/Assicurazioni in settlement discussions with Hedman, culminating in the execution of their policy buy-back agreement on November 22, 2012, and continuing through the present. According to her Affidavit, at some unknown point during her representation of Harper/Assicurazioni, she learned that Hedman was in possession of documents "related to its insurance program and the Gulf & Western Industries, Inc., insurance program." Ms. Franzese

was informed by some unknown person that Hedman had allowed certain unidentified insurance carriers to inspect these documents upon agreement that they could not be copied.

Ms. Franzese's Affidavit raises several questions which cast doubt on the reliability and relevance of the assertions made in her Affidavit. The Defendants' most fundamental coverage defense is their assertion that Hedman was not qualified as a named insured under the policies issued to Gulf & Western Industries, Inc.  Why then are the Defendants now, for the first time since this direct action litigation began more than two years ago, alleging the existence of insurance records allegedly in the possession of the judgment debtor somewhere in Canada and allegedly inspected (but not copied) by some unknown insurance company attorneys.

In point of fact, Ms. Franzese was herself among a group of attorneys and claims representatives that were given access in late 2011 to approximately 165 boxes of records for the purpose of determining Hedman's insurance coverage - past, present and future.  Duggan Reply Declaration, Reply Ex. 21. Whether or not Ms. Franzese, who at the time was with the firm of Riker Danzig representing Defendant Harper/Assicurazioni as well as Defendant excess carrier Seaton, was among the persons who engaged in the document inspection is not known.  She was, however, certainly invited to the Iron Mountain facility in Brampton, Ontario in November 2011 to review "documents relating to Hedman's claims for insurance coverage."  Since Hedman agreed "to assist the insurers (by way of consenting to the copying of documents and removal from Canada) on any applications to the Canadian court or other relevant authority to obtain copies of the documents," it is respectfully submitted that Defendants should not be permitted to keep this

Court from reaching and deciding the merits of plaintiff's motion for summary judgment by suggesting the need for a document inspection that has already occurred.[9]

**B.    There Are No Grounds To Grant Discovery On The Defendants' Claim That The *Muir* Verdict Was Based Upon Expected And Intended Acts Of Hedman**

Continental's purported need for discovery from the Plaintiff on the question of whether Hedman expected or intended injury to Joseph Muir is equally groundless.  There was ample evidence submitted in the underlying personal injury action that Hedman was negligent in its failure to warn Joseph Muir and others of the dangers of exposure to the asbestos that Hedman sold to the Durez factory. There is not a shred of evidence that would allow a trier-of-fact to conclude that Hedman expected that inhalation of its asbestos fibers would cause bodily harm to Joseph Muir or to anyone else at Durez.

There is equally no evidence that any cases of cancer, including mesothelioma, were manifest among the Durez work force until several years after Hedman discontinued selling asbestos to Durez.  There is no evidence that Hedman intended by its actions or omissions to cause bodily harm to anyone at any time.  In any event, directing discovery on this issue to the Plaintiff is an entirely futile and meaningless act, as Joseph Muir's widow, Nancy, born on January 24, 1959, has no personal knowledge of what Hedman expected or intended forty or fifty years ago.

---

[9] The hypocrisy of Ms. Franzioni's affidavit is demonstrated by Defendant Seaton's coverage form of February 28, 2012 regarding Hedman's named insured status:

> Two different law firms have examined the 'named-insured' issue for Seaton, and neither saw this as a viable coverage defense, if litigated.

Presumably, one of the law firms referenced in this memorandum was the Riker Danzig firm where Mr. Puhala and Ms. Franzese were associates and represented Seaton and the Harper/Assicurazioni companies during the *Failing* settlement and in the Seaton and Harper/ Assicurazioni buy-back transactions with Hedman.   Duggan Declaration, *Mineweaser* Docket 118-7, Ex. 74.

Defendant Continental argues illogically that the burden is on the Plaintiff to establish the negative proposition that Hedman neither expected nor intended bodily injury to Joseph Muir. Indeed, evidence that Hedman ever had an expectation or intention to cause harm so as to preclude coverage under the Continental policies, was available, if it ever existed, to the defendant excess insurers, and certainly not to Nancy Muir since 2005.  After all, it was Continental that negotiated one of the four policy buy-back agreements entered into with Hedman in 2012.  The agreement was actually the last to be finalized, as it was signed on December 31, 2012. According to the self-serving Declaration of Connie Gianakas, a Vice President at Resolute Management, Inc., the claim administrator for Continental, the policy buy-back agreement "was negotiated at arm's length, for good and fair consideration, by sophisticated parties."  The so-called "Settlement Agreement" was, according to Gianakas, the "resolution of a coverage dispute." Continental engaged in negotiation with Hedman throughout 2012. During this time, "Hedman was threatening to commence a declaratory judgment action against Continental in the event no settlement would be reached." Declaration of Connie Gianakas, *Mineweaser* Docket 134-2, paragraph 2 and 3.

Given Continental's assertion of dealing with Hedman throughout 2012 and the fact that both parties were represented by sophisticated legal representatives, it is most obvious that Continental's argument now of needing discovery on the question of what Hedman expected or intended forty or fifty years ago amounts to nothing more than a hollow pretext to forestall summary judgment.

Defendant Harper/Assicurazioni also makes the specious argument that it has "viable coverage defenses based on the 'unexpected and intended' clause and 'concealment,' which at the very least, raises issues of material fact." Defendant Harper/Assicurazioni's Memorandum of Law, *Muir* Docket 31, p. 13.  Again, given the extensive record of litigation involving three previous

related actions, the fact that "discovery has not yet begun" in the *Muir* action is totally irrelevant. It is further respectfully submitted to this Court that, as a matter of law, Hedman could not be deemed to have expected or intended to cause bodily injury to Mr. Muir.

**C.    The Defendants Have No Basis To Ask For Discovery Regarding Mr. Muir's Exposure To Hedman's Asbestos Fiber**

Contrary to Continental's bald assertions, there are no material issues of fact pertaining to the timing of Joseph Muir's injury.  Yet Continental seeks "Factual information, other than certain materials sent by Plaintiff to Continental, related to Joseph L. Muir's injury and underlying trial against Hedman, including medical records, complaints, depositions, or any other document that details any aspect of the underlying claim." Declaration of Rachel H. Bevans, *Muir* Docket 32-3, paragraph 7.

Continental admits that the Plaintiff has already sent the Defendant "certain materials," without bothering to identify those materials.  After trial of the underlying action in New York State Supreme Court, Justice Deborah Chimes explicitly found that while "Joseph Muir was working for Durez during the summers of 1976 and 1977 he would handle and test molding compound from Building 88 which contained Hedman asbestos fiber."  She further found that this handing and testing created visible dust, which he inhaled. The trial court judge also credited the opinion of Dr. Mark Utell that Muir's exposures to Hedman's asbestos fibers during the summers of 1976 and 1977 were a substantial factor in causing his pleural mesothelioma. Plaintiff's SOMF, *Muir* Docket 27-8, p. 8-9.

Defendants simply have no standing to re-litigate Plaintiff's underlying asbestos-related personal injury claims.  Their theory that Mr. Muir did not suffer an injury during the policy period in question because his claim did not accrue for purposes of the statute of limitations until his disease became manifest in 2014 has been thoroughly refuted by numerous decisions of the New

York State Court of Appeals. *See*, *In re: Viking Pump, Inc. and Warren Pumps, LLC, Insurance Appeals,* 27 N.Y.3d 244 (2016); *Continental Casualty Co. v. Rapid-American Corp*., 80 N.Y.2d 640 (1993). According to a well-developed body of New York jurisprudence, the tortious injury in a toxic exposure case occurs at the time of exposure, not at the time of manifestation of the disease. It is also axiomatic that a liability insurer that refused to defend and indemnify its insured cannot later have the right to re-litigate the action which resulted in a judgment.

**D.    The Defendants Have No Basis To Ask For Discovery To Retain An Expert**

Harper/Assicurazioni argues that, if necessary, they "may produce expert testimony on the custom and practice of insurance coverage and how a financially struggling company, such as Hedman, would not pay for concurrent insurance coverage if it already had coverage under the Gulf & Western policies." Defendant Harper/Assicurazioni's Memorandum of Law, *Muir* Docket 31, p 11.  In essence, Harper/Assicurazioni seeks to preclude this Court from reaching the merits of Plaintiff Muir's motion for summary judgment by arguing that because Hedman may have had some coverage in addition to that provided under the Gulf & Western Industries, Inc. policies, it would follow that Hedman must not have been qualified as a named insured under those policies. This speculative theory ought to be dismissed out of hand, especially in the absence of any supporting expert affidavit.

If Harper/Assicurazioni had an expert willing to speculate about the insurance-buying practices of companies like Hedman, wouldn't they have submitted at least the name of such an expert, even if not his or her Affidavit?

It is respectfully submitted to this Court that there is no validity to any of the reasons set forth by either Defendant Continental or Harper/Assicurazioni for the need for discovery on any issue. Mrs. Muir has nothing additional to offer. She has no personal knowledge or information

concerning Hedman's status as a subsidiary of Gulf & Western Industries Inc., and thus additional discovery in this litigation or any discovery at all in her action would be pointless.

## **CONCLUSION**

In sum, for the reasons stated in the Plaintiffs' prior submissions and this Reply, the Court should enter summary judgment in favor of the creditors enforcing the recovery and payment of their judgments jointly from the excess insurer Defendants under New York Insurance Law §3420. Nothing in the Defendants' opposition submissions changes that result. It is respectfully requested that this Court follow *Viking Pump* and award summary judgment to Mrs. Muir and require the Defendants pay her unsatisfied judgment of $5,856,171.85 from the multi-tier excess policies they issued for the 1976-1977 policy year.

Dated:  Buffalo, New York
      August 18, 2016

Respectfully submitted,

LIPSITZ & PONTERIO LLC

      s/ John N. Lipsitz
John N. Lipsitz
*Attorneys for Plaintiff Nancy M. Muir*
135 Delaware Avenue 5th Floor
Buffalo, New York 14202
Telephone: 716-849-0701
jnl@lipsitzponterio.com

DUGGAN PAWLOWSKI & COOKE LLP

      s/ James J. Duggan
James J. Duggan
*Attorneys for Plaintiff Nancy M. Muir*
403 Main Street, Suite 700
Buffalo, New York 14203
Telephone: 716-575-5529
jduggan@dpc-law.com